IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

THOMAS MURPHY,
     Plaintiff,

vs.                                 Case No. 5:06cv138/SPM/EMT

MICHAEL J. ASTRUE,[1]
Commissioner of the
Social Security Administration,
     Defendant.
_____/

## ORDER, REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act"). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act and for Supplemental Security Income benefits ("SSI") under Title XVI of the Act.

     Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

---

[1]Michael J. Astrue succeeded Jo Anne B. Barnhart, and is presently the Commissioner of the Social Security Administration. Therefore, he is automatically substituted as Defendant. *See* Fed. R. Civ. P. 25(d)(1).

## I.      PROCEDURAL HISTORY

On April 5, 2004, Plaintiff filed applications for DIB and SSI under Titles II and XVI of the Act (Tr. 44–46, 175–76).[2]  *See* 42 U.S.C. §§ 401–34, 1381–83.  Plaintiff's applications were denied initially and on reconsideration (Tr. 20–29, 179–88), and a request for a hearing before an Administrative Law Judge ("ALJ") was timely filed.  An administrative hearing was held on July 25, 2005 (Tr. 198–209).  The ALJ found Plaintiff "not disabled" in a decision dated January 10, 2006 (Tr. 9–19).  The Appeals Council denied Plaintiff's request for review on April 29, 2006 (Tr. 5–8).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  This appeal followed.

## II.     FINDINGS OF THE ALJ

On January 10, 2006, the ALJ made several findings relative to the issues raised in this appeal (Tr. 12–19):

1)      Plaintiff meets the nondisability requirements for a period of disability and DIB set forth in Section 216(i) of the Act and is insured for benefits through December 31, 2003.

2)      Plaintiff has not engaged in substantial gainful activity since December 31, 2002, the amended alleged onset of disability (*see* Tr. 13).

3)      Plaintiff's neck pain, back pain, and status post surgery and pain in right thumb are considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(c).[3]

4)      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5)      Plaintiff's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the ALJ's decision.

---

[2]All references to "Tr." refer to the Transcript of Social Security Administration Record filed on August 21, 2006 (*see* docket entry 7).

[3]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims.  *See* 20 C.F.R. §§ 404, 416.  Therefore, hereafter, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

6)      Plaintiff has the following residual functional capacity ("RFC"): light work with a sit/stand option.  Plaintiff can do unskilled or semi-skilled work.

7)      Plaintiff is unable to perform any of his past relevant work (20 C.F.R. § 404.1565).

8)      Plaintiff is closely approaching advanced age.

9)      Plaintiff has a "high school education" (20 C.F.R. § 404.1564).

10)     Plaintiff has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 C.F.R. § 404.1568).

11)     Plaintiff has the RFC to perform the full range of light work (20 C.F.R. § 404.1567).

12)     Based on an exertional capacity for light work, and Plaintiff's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rules 202.13 and 202.14.

13)     Plaintiff was not under a "disability" as defined in the Act, at any time through January 10, 2006, the date of the ALJ's decision (20 C.F.R. § 404.1520(g)).

(Tr. 18–19).

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but

not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.      Personal History

Plaintiff testified at a hearing before the ALJ on July 25, 2005 as follows.  He was fifty-two years old and a high school graduate (Tr. 199, 203; see Tr. 48 (birth certificate)).  He was last employed in 2001 as a concrete finisher where he operated a finishing machine and engaged in manual labor, including sawing and troweling (Tr. 199–200; see Tr. 56 (listing prior employment)).  Plaintiff also previously worked as a chef's assistant where he was responsible for retrieving stock, including cases of chicken weighing between 65 and 120 pounds, and sometimes making ice sculptures from blocks of ice weighing up to 450 pounds (see Tr. 56, 200).  Plaintiff explained that while he was working with concrete he "broke [his] thumb" and has a lot of pain in his right hand (see Tr. 201).  Plaintiff stated that he "can't hold onto anything, it just fall[s] out of my [right] hand" (id.).  Plaintiff also stated that he has problems sleeping and sometimes "sleep[s] maybe four or five hours at night and then in the morning I get up at different times because I twist and turn and it [is] just like my neck and stuff, you know, hurts sometimes just like it's broken or something" (id.).  Plaintiff also testified that he cannot stay in one position for a long period of time (Tr. 201–02).  With respect to his physical limitations, Plaintiff testified that he cannot lift much more than fifteen to twenty pounds (Tr. 203).  He gets cramps when he reaches overhead (id.).  He has problems gripping things because his right hand will not close (id.).  Plaintiff estimated that he cannot sit or stand more than twenty to thirty minutes (Tr. 203–04).  Plaintiff also testified that he cannot walk

farther than one block without resting (Tr. 204).  Finally, Plaintiff testified that he sometimes has lower back pain that "pulls both sides of my legs and my back" (Tr. 204–05).

Plaintiff has not had a job since he worked as a concrete finisher and chef's assistant (Tr. 205).  He has attempted to find employment but has been unable to retain a job (*id.*).  He testified that it is hard for him to write because he cannot grip a pen with his right hand (*id.*).  The ALJ asked Plaintiff if he could do lighter work, and Plaintiff answered "I probably could" (Tr. 206).

In his DIB application, Plaintiff indicated that his debilitating injury was the result of an injury to his right hand, sustained while working on December 26, 2001, and an automobile accident that occurred on February 6, 2002 (Tr. 43, 46).  A disability report filed by Plaintiff indicates that he is disabled because he "can't hold a tool anymore — and because of my neck and back problems my legs give out on me and it is hard for me to walk and sit" (Tr. 55–56).  In a disability report appeal, Plaintiff stated that "it's difficult to bend to tie my shoes . . . I have hardly no grip with my right hand . . . my legs collapse at random" (Tr. 87).  In the remarks section of his disability report appeal form, Plaintiff states "I cannot write without extreme pain so I ask[ed] my sister to complete this form for me" (Tr. 88).  He also stated, "I am not a lazy person and have worked all my life, and I desire to work now but I can't" (Tr. 89).

B.      Relevant Medical History

On March 14, 2002, Plaintiff presented to Dr. Timothy Nichols, M.D., at the Bay Medical Center (Tr. 149).  Dr. Nichols noted Plaintiff's report that he had been in an automobile accident on February 6, 2002 (*id.*).  Dr. Nichols stated that Plaintiff was taken to the Bay Medical Center emergency room where he was treated for lacerations to his left eyebrow (*id.*).  During his emergency room visit, Plaintiff also reported pain in his neck and shoulder, worse on the <u>left side</u> than on the right side, and numbness in his <u>left arm</u> (*id.*).  During his March 14 visit to Dr. Nichols, Plaintiff reported neck and shoulder pain, worse on the left side, paresthesias[4] of his left arm and hand, and muscle spasms of the cervical spine and trapezius areas (*id.*).  Dr. Nichols noted that Plaintiff had no history of previous neck or arm difficulties but had carpal tunnel surgery on the right

---

[4]Paresthesia is an abnormal tactile sensation that occurs spontaneously without a sensory stimulus; it is often described as burning, tingling, creeping, or pricking. *See* ATTORNEY'S ILLUSTRATED MEDICAL DICTIONARY P10 (1997).

arm in the past (*id.*). Dr. Nichols reported that Plaintiff had no complaints of headaches, nor any respiratory cardiovascular, gastrointestinal, endocrine system, or neuropsychiatric system complaints (*id.*). Dr. Nichols also noted that Plaintiff was taking no medication at present (Tr. 148). On examination, Dr. Nichols noted that Plaintiff's head, ears, nose, and throat were unremarkable (*id.*). Plaintiff's neck was moderately to severely tender to palpation in the mid and lower cervical spine and trapezius areas (*id.*). Dr. Nichols opined that Plaintiff's neck was limited to sixty-percent of its normal movement. The "Spurlings test cause[d] neck and trapezius pain, [and] some pain into his upper extremities" (*id.*). Dr. Nichols found no abnormalities in Plaintiff's chest, heart, or abdomen (*id.*). "Motor examination shows normal upper extremity strength [], deltoids, biceps, triceps, wrist flexors or wrist extenders, and grip all within normal limits" (*id.*). "Lower extremity strength is normal, with hip flexors, hip extenders, quadriceps, hamstrings, dorsiflexion[,] and plantar flexion all within normal limits" (*id.*). Finally, Dr. Nichols reported that examination showed normal sensation to pinprick in Plaintiff's arms, hands, legs, feet, and trunk (*id.*). Dr. Nichols also reported that Plaintiff's gait was normal (*id.*). Dr. Nichols impression was "neck and arm pain, paresthesias of [Plaintiff's] upper extremities, [and] bilateral shoulder pain" (Tr. 147). Dr. Nichols recommended that Plaintiff engage in outpatient physical therapy, cervical epidural and trigger point injections, and an EMG-NCV study of his upper extremities (*id.*).

On March 30, 2002, an MRI of Plaintiff's cervical spine revealed "[s]evere neural formainal effacement secondary to oncovertebral joint hypertrophy, reversal of normal cervical lordosis with no real spinal canal stenosis, no evidence for disk herniation" (Tr. 146).

On April 4, 2002, Plaintiff presented to Merle P. Stringer, M.D.,[5] for a paravertebral nerve block procedure and a cervical epidural steroid injection (Tr. 145). Paracervical blocks were performed at C4-5 and C5-6 bilaterally and the C4-5 interspace was anesthetized (*id.*). A cervical epidural steroid injection was also performed (*id.*). Dr. Stringer noted that Plaintiff tolerated the

---

[5]Dr. Stringer's records are extensive and detailed; however, for purposes of this court's review, it is sufficient to note that Dr. Stringer's examinations of Plaintiff essentially showed two basic results: (1) marked or moderate tenderness of the cervical spine, some evidence of paracervical muscle spasm, some weakness in Plaintiff's upper extremity strength, and spotty loss of sensation to pinprick, or (2) moderate limitation of neck flexion and extension, no evidence of paracervical muscle spasm, normal upper extremity strength, and normal sensation to pinprick (*see* Tr. 104–45, 167–72). Lower extremity strength and grip strength were consistently noted as normal (*see id.*). For the sake of clarity, Dr. Stringer's records are set forth in an abbreviated manner below.

procedure well (*id.*).  Dr. Stringer instructed Plaintiff to apply an ice pack to his neck and prescribed Percocet 10 mg for pain (*id.*).

On April 8, 2002, an MRI of Plaintiff's cervical spine revealed disc space narrowing and hyperostosis at C5-7 and C6-7 (Tr. 142).  Mild "chronic appearing loss of vertebral body height at C5-6 and C6-7" and "mild to moderate neural foraminal stenosis bilaterally at C4-5 and to a moderate extent at C5-6" were also noted (*id.*).

On April 5, 2002, x-rays of Plaintiff's right and left shoulders revealed no defects and no soft tissue injuries (Tr. 143, 144).

On April 11, 2002, Plaintiff returned to Dr. Stringer for further paravertebral nerve blocks and cervical epidural steroid injections (Tr. 141).  Paracervical blocks were performed at C4-5 and C5-6 bilaterally, and the C4-5 interspace was anesthetized (*id.*).  A cervical epidural steroid injection was also performed (*id.*).  As before, Plaintiff was instructed to apply an ice pack to his neck and was given a prescription for Percocet 10 mg (*id.*).

On April 17, 2002, Plaintiff was examined by Dr. Stringer (Tr. 140).  Dr. Stringer reported that Plaintiff had completed a course of cervical epidural steroid injections with improvement in his neck pain, but "he is still having muscle spasms [in] the cervical spine area, [and] paresthesias of his left arm and hand" (*id.*).  Dr. Stringer also noted that the MRI of Plaintiff's cervical spine from March 30, 2002 showed severe neural formina narrowing on the left side at C3-4, and bilaterally at C4-5, C5-6, and C6-7 (*id.*).[6]  Dr. Stringer commented that x-rays of Plaintiff's left spine were normal, but x-rays of his cervical spine showed degenerative changes (*id.*).  Dr. Stringer reported that Plaintiff had "upper extremity strength, deltoids, biceps, triceps, wrist flexors and wrist extenders, and grip all within normal limits" (Tr. 139).  Dr. Stringer's impression was "[c]ervical disc disease, neck pain, foraminal stenosis, severe at C4-C5, C5-C6, C6-C7, with some clinical evidence of nerve root irritation" and "[m]yofascitis of the cervical spine with trigger point tenderness, [and] occipital neuritis on the left" (*id.*).  Dr. Stringer recommended occipital nerve blocks and trigger point injections, which he indicated he would perform on the same day (*id.*).  Dr. Stringer reported performing trigger point injections over the left occipital nerve, including the four

---

[6]Dr. Stringer referenced an MRI performed on March 29, 2002 but the record shows that the MRI was actually conducted on March 30, 2002 (*see* Tr. 146).

areas over the splenius capitis, semispinalis, levator scapulae, and trapezius muscles on the left (Tr. 138).  Plaintiff was instructed to apply ice and heat to the affected areas and to return for a follow-up appointment (*id.*).

On April 18, 2002, a third series of paravertebral nerve blocks and cervical epidural steroid injections were performed by Dr. Stringer with the same results as described *supra* (Tr. 137).

On June 5, 2002, Plaintiff returned to Dr. Stringer for follow-up (Tr. 136).  Dr. Stringer noted that Plaintiff had completed a course of cervical epidural steroid injections with "improvement in his pain and muscle spasm, but [he is] still having pain in his neck and his upper extremities, worse on the left . . . [and] has paresthesias of the upper extremities" (*id.*).  Plaintiff's neck showed moderate tenderness to palpation of the cervical spine and both trapezius; moderate muscle spasm and myofascitis with trigger point tenderness, but less than prior to the injections; and a positive Spurling's test bilaterally, worse on the <u>left</u> (*id.*).  "Motor examination show[ed] weakness of his deltoid, biceps and triceps more on the <u>left</u> than the right" (Tr. 135) (emphasis supplied).  His lower extremity strength was normal (*id.*). "Sensory examination shows spotty loss of sensation to pinprick over both arms and hands, worse on the <u>left</u> than on the right" (*id.*) (emphasis supplied).  Dr. Stringer explained that Plaintiff told him "his muscle spasm and neck pain is improved [but] that he is still having significant pain in his upper extremities and some paresthesia" (*id.*).  Plaintiff told Dr. Stringer that he wanted to proceed with surgery (*id.*).  Dr. Stringer recommended that "he be admitted for cervical myelogram to more completely evaluate this problem and to be followed by surgery" (*id.*).

On June 18, 2002, Dr. Stringer performed a cervical myelogram which revealed "small ventral defects [] associated with osteopytes at C3-4, C4-5, and C5-6" (Tr. 133).  Dr. Stringer also noted that "due to faint quality of contrast, axillary sleeves are not well seen" (*id.*).  Dr. Stringer's impression was "mild multilevel degenerative joint disease" (*id.*).  Dr. Stringer also performed a CT scan and found that: C2-3 is normal; C3-4 shows minimal osteophyte formation with no associated disc disease, no encroachment upon the spinal cord, and normal axillary sleeves; C4-5 shows mild posterior osteophyte formation slightly greater on the <u>left</u> than the right, axillary sleeves blunted as a result, and mild narrowing of the neural formina, particularly on the <u>left</u>; C5-6 shows moderate posterior osteophyte formation and narrowing of the neural formina and blunting of the axillary

sleeves with possible small amount of disc material in the right neural foramen, and no encroachment upon the cervical spinal cord; C6-7 shows milder disc disease with mild narrowing of the neural foramina; and C7-T1 is normal (Tr. 131). Dr. Stringer's impression was multilevel degenerative disc disease (*id.*).

On July 2, 2002, Plaintiff presented to Dr. Stringer reporting "increasing pain in his neck, [and] pain in both arms, worse on the left" (Tr. 130) (emphasis supplied). Plaintiff's neck showed "marked tenderness to palpation in the mid and lower cervical spine area and both trapezius, marked muscle spasm, marked myofascitis, increased pain with neck movement . . . [and a positive] Spurling[']s test [] bilaterally" (*id.*). Motor examination revealed weakness in Plaintiff's deltoids and biceps bilaterally, but otherwise normal upper extremity and grip strength (Tr. 129). "Sensory examination show[ed] spotty loss of sensation to pinprick over the C5-C6 distributions bilaterally" (*id.*). Dr. Stringer noted that Plaintiff "relates he is much worse [and] would like to proceed with surgery" (*id.*). "He has not responded to conservative treatment" (*id.*). Dr. Stringer prescribed Lortab 10 and Flexeril and instructed Plaintiff "not to take his medicine while he is driving or working" (*id.*).

On July 19, 2002, Plaintiff presented to Dr. Stringer to discuss surgery (Tr. 128). Dr. Stringer advised Plaintiff that his automobile insurance was exhausted, and Plaintiff would have to pay cash for future procedures or file on his BCBS (believed to be Blue Cross Blue Shield) insurance (*id.*). Plaintiff insisted that Dr. Stringer file on his automobile insurance, but Dr. Stringer explained to Plaintiff that there was "no more money in it," and Plaintiff left without scheduling surgery (*id.*).

On December 31, 2002, Plaintiff returned to Dr. Stringer complaining of "pain involving his neck and both upper extremities, worse on the right" (Tr. 128) (emphasis supplied).[7] Dr. Stringer also reported "some numbness involving his hands" and noted that Plaintiff did not follow through with surgery due to financial reasons (*id.*). Dr. Stringer opined that Plaintiff "is unable to return to work in the construction industry due to his symptomatology" (*id.*). Plaintiff's neck showed no evidence of paracervical muscle spasm, but had "some moderate limitation of [] flexion and

---

[7]The court notes that Plaintiff previously complained of pain and injury on the left but was now complaining of pain on the right.

extension, secondary to pain," localized in the base of the neck (Tr. 127).  Upper and lower extremity strength, grip strength, sensation to pinprick, and gait were normal (*id.*).  Dr. Stringer's impression was "[n]eck pain, radiating into the right upper extremity" and "[c]ervical cord and nerve root compression at C4-C5 and C5-C6" (*id.*).  He also noted that Plaintiff would like to proceed with surgery (*id.*).  Dr. Stringer referred Plaintiff to vocational rehabilitation for assistance (*id.*).  Dr. Stringer also opined that "approximately six weeks post surgery he should be able to return to work at light duty" (*id.*).

On January 28, 2003, Plaintiff presented to Dr. Stringer for follow-up complaining of pain involving his neck and right upper extremity, which was persistent and severe, as well as numbness in his right arm (Tr. 126).  Dr. Stringer noted that Plaintiff had no difficulty with ambulation (*id.*).  Examination of Plaintiff's neck showed no changes from his last visit (*id.*).  "Motor examination show[ed] he has some mild weakness of his right biceps and deltoid" but otherwise normal upper extremity, lower extremity, and grip strength (Tr. 125).  Sensory examination showed "decreased appreciation of sensation to pinprick involving his right hand" but otherwise normal sensation to pinprick (*id.*).  Dr. Stringer's impression remained unchanged from Plaintiff's last visit (*id.*).  Dr. Stringer noted that Plaintiff had still not heard from vocational rehabilitation regarding authorization for surgery, "apparently [because they] are inquiring as to whether [Plaintiff] will be able to return to work following surgery" (*id.*).  Dr. Stringer again opined that he "would expect [Plaintiff] to be able to return to work approximately six to eight weeks following surgery" (*id.*).

On February 12, 2003, Plaintiff returned to Dr. Stringer with continued complaints of pain involving his neck and right upper extremity and some numbness and weakness involving his right arm (Tr. 124).  Dr. Stringer noted that Plaintiff had still not heard from vocational rehabilitation (*id.*).  Plaintiff's neck showed some evidence of paracervical muscle spasm and moderate limitation of neck flexion and extension, secondary to pain in his neck and right shoulder (*id.*).  Motor examination showed some mild weakness of Plaintiff's right deltoid and biceps, but otherwise normal upper extremity, grip, and lower extremity strength (Tr. 123).  Sensory examination showed decreased appreciation of sensation to pinprick involving the dorsum of the right hand (*id.*).  Dr. Stringer's impression remained unchanged from Plaintiff's last visit (*id.*).

On March 14, 2003, Plaintiff presented to Dr. Stringer complaining of neck and right arm pain with paresthesias of his right arm and hand (Tr. 122).  Physical examination of Plaintiff's neck showed "marked tenderness to palpation in the cervical spine area and right trapezius, marked muscle spasm, myofascitis, [and] limitation of neck movement to [fifty percent] of normal" (*id.*).  Motor examination showed normal upper extremity and grip strength, except the "right biceps and deltoid [were] rated at 3+/5" (Tr. 121).  Plaintiff had spotty loss of sensation in his right upper arm and otherwise normal sensation (*id.*).  Dr. Stringer's impression was "[c]ervical disc disease, neck pain, right arm pain, increasing difficulty at this time" and "nerve root compression of C4-C5, C5-C6 on the right" (*id.*).  Dr. Stringer noted that Plaintiff had still not obtained authorization for surgery (*id.*).  He prescribed Lortab 10 and again instructed Plaintiff "not to take any medicine while he is driving or working" (*id.*).

On March 28, 2003, Plaintiff returned to Dr. Stringer complaining of neck and arm pain, worse on the right; paresthesias of his right arm; and muscle spasms of the cervical spine area, worse with activity (Tr. 121).  Examination of Plaintiff's neck showed "marked tenderness to palpation in the cervical spine area and both trapezius, marked muscle spasm, myofascitis, [and] increased pain with neck movement" (Tr. 120).  Motor and sensory examination revealed unchanged results from Plaintiff's last visit, and Dr. Stringer's impression remained unchanged (*see* Tr. 119–20).  Dr. Stringer noted that surgery was recommended, but Plaintiff was unable to get authorization for the procedure (*id.*).  Dr. Stringer prescribed Lortab 10 (*id.*).  He also noted "the longer [Plaintiff] delays surgical decompression, the more likely he will have [a] permanent neurological deficit" (*id.*).

On April 29, 2003, Plaintiff returned to Dr. Stringer with continuing pain in his neck and right upper extremity and numbness in his right hand (Tr. 118).  An examination of Plaintiff's neck revealed some evidence of paracervical muscle spasm and moderate limitation of neck flexion and extension,  secondary to pain in Plaintiff's neck (*id.*).  Motor examination showed normal upper and lower extremity strength (*id.*).  Plaintiff also had normal grip (*id.*).  Sensory examination was reported as "intact to pinprick, position sense and light touch" but with "decreased appreciation of sensation to pinprick involving [Plaintiff's] right hand and forearm" (Tr. 117).  Dr. Stringer's impression remained unchanged and he continued to note Plaintiff's problem obtaining authorization for surgery (*id.*).  Dr. Stringer prescribed Tylenol 3 (*id.*).

On May 13, 2003, Plaintiff returned to Dr. Stringer with continuing pain in his neck and both upper extremities, worse on the right, and some numbness in his extremities (Tr. 117).  Dr. Stringer noted that Plaintiff had still not obtained authorization for surgery (*id.*).  Neck examination showed no evidence of paracervical muscle spasm and moderate limitation of neck flexion and extension, secondary to pain localized in the base of Plaintiff's neck and both shoulders (Tr. 116).  Motor examination showed normal upper and lower extremity strength; grip strength was also normal (*id.*).  Sensory examination showed upper and lower extremities were intact to pinprick (Tr. 115).  Dr. Stringer's impression was "[n]eck pain radiating to upper extremities, right greater than left"; "[c]ervical cord and nerve root compression of C4-C5, C5-C6"; and "[d]egenerative changes of the cervical spine" (*id.*).

On June 10, 2003, Plaintiff presented to Dr. Stringer for follow-up (*id.*).  Dr. Stringer noted that "[h]e is not working at this time" (*id.*).  After examining his neck, Dr. Stringer reported "marked tenderness to palpation in the cervical spine area and right trapezius, marked muscle spasm, myofascitis, increased pain with neck movement . . . [and the] Spurling[']s test causes pain in his neck and down both arms, worse on the right" (Tr. 114.).  Motor examination showed normal upper and lower extremity strength; normal grip was also noted (*id.*).  Sensory examination was normal (*id.*).  Dr. Stringer's impression was "[n]eck and right arm pain, continuing with difficulty at this time" and "nerve root compression [at] C4-C5 and C5-C6 on the right" (Tr. 113).  Dr. Stringer noted that surgery had still not been authorized (*id.*).  He prescribed Lortab 5 (*id.*).

On July 14, 2003, Plaintiff returned to Dr. Stringer for follow-up (*id.*).  Dr. Stringer noted that "[h]e is not working . . . [and] is having increasing difficulty at this time" (*id.*).  Neck examination revealed marked cervical spine tenderness and marked muscle spasm as before (Tr. 112).  Motor examination showed normal upper extremity and lower extremity strength but 4/5 grip strength (*id.*).  Plaintiff had spotty loss of sensation to pinprick over his right arm and hand but otherwise normal sensation (*id.*).  Dr. Stringer's impression remained unchanged (*id.*).  Dr. Stringer noted that no surgery had been authorized (Tr. 111).  Plaintiff was given a prescription for Lortab 10 (*id.*).

On August 13, 2003, Plaintiff presented to Dr. Stringer for follow-up and reported unchanged pain in his neck and right upper extremity but "no numbness, no weakness, [and] no

paresthesias" (*id.*).  Plaintiff had still not obtained authorization for surgery (*id.*).  Examination of Plaintiff's neck revealed no paracervical muscle spasm, moderate limitation of neck flexion and extension, and a positive Spurling's test on the right (Tr. 110).  Motor examination of the upper and lower extremities showed normal results including normal grip strength (*id.*).  "Straight leg reflex at [75 degrees] result[ed] in some mild low back pain" (*id.*).  Dr. Stringer's impression remained unchanged from Plaintiff's list visit (*id.*).  Plaintiff was given a prescription for Talacen (*id.*).

On November 24, 2003, Dr. Stringer's records indicate that Plaintiff called in for a refill of Talacen for pain (Tr. 109).

On January 15, 2004, Plaintiff returned to Dr. Stringer complaining of pain in his neck and right upper extremity and numbness in his right arm (*id.*).  No surgical authorization had been obtained (*id.*).  A neck examination showed no evidence of paracervical muscle spasm, but some moderate limitation of neck flexion and extension, secondary to pain (Tr. 108).  Motor examination of the upper and lower extremities was normal (*id.*).  Sensory examination showed decreased appreciation to pinprick in Plaintiff's right hand (*id.*).  Dr. Stringer's impression remained unchanged (*id.*).  He prescribed Tylenol 3 (*id.*).

On February 13, 2004, Plaintiff returned to Dr. Stringer complaining of increasing pain in his neck and right arm, paresthesias of his right upper extremity, and muscle spasms worse with activity (Tr. 107).  Examination of Plaintiff's neck showed "marked tenderness to palpation in the mid and lower cervical spine area, both trapezius, marked muscle spasm, myofascitis, and increased pain with neck movement (*id.*).  Motor examination "shows left upper extremity and both lower extremities are 4/5, right upper extremity is 3+/5" (Tr. 106).  Sensory examination showed spotty loss of sensation to pinprick over the right upper extremity and normal sensation to pinprick involving the left arm and hand, legs, feet, and trunk (*id.*).  Dr. Stringer's impression remained unchanged (*id.*).  Plaintiff was prescribed Lortab 7.5 (*id.*).

On April 14, 2004, Plaintiff presented to Dr. Stringer with pain in his neck and right arm, and paresthesias and weakness of his right upper extremity (Tr. 105).  Dr. Stringer noted that

"Plaintiff is not working, he last worked ten and a half years ago" (*id.*).[8]  Examination of Plaintiff's neck showed marked tenderness to palpation in the mid and lower cervical spine area and right trapezius, marked muscle spasm, myofascitis, and increased pain on extremes of neck movement (*id.*).  A Spurling's test was positive on the right (*id.*).  Motor examination showed upper and lower extremities at 4/5, with right upper extremity at 3+/5 (Tr. 104).  Plaintiff had spotty loss of sensation to pinprick over his right upper extremity (*id.*).  Dr. Stringer's impression was "[c]ervical disc disease, neck pain, right arm pain, paresthesias and weakness of his right upper extremity, some evidence of nerve root irritation and/or compression, increasing difficulty at this time" and "disc herniation of C4-C5, C5-C6 with nerve root compression" (*id.*).  Dr. Stringer noted that surgery was recommended but that Plaintiff had still not obtained authorization (*id.*).  Dr. Stringer also recommended that MRIs be repeated (*id.*).  Dr. Stringer gave Plaintiff "a note [] indicating that he is having increasing difficulty, [and] in my opinion he requires the MRI scan as soon as possible, and surgery" (*id.*).

On April 11, 2004, Plaintiff presented to the Bay Medical Center emergency room complaining of chest pain (Tr. 93–94).  The physician who examined him noted that he had high blood pressure (*id.*).  The physician made no remarks concerning his neck, back, or hand.

On May 14, 2004, Plaintiff presented to Dr. Stringer complaining of pain in his neck and right upper extremity and numbness in his right hand (Tr. 104).  "Examination of his neck reveal[ed] no evidence of paracervical muscle spasm.  He has some moderate limitation of neck flexion and extension, more to stiffness than of pain" localized in the base of his neck (Tr. 103).  The Spurling's test was positive on the right (*id.*).  Motor examination showed normal upper and lower extremity strength and normal grip, except "some mild weakness of his right biceps" (Tr. 103).  Sensation examination showed "slight decreased appreciation of sensation to pinprick involving his right hand" (Tr. 102).  Dr. Stringer prescribed Tylenol 3 (*id.*).

On August 24, 2004, Plaintiff returned to Dr. Stringer (Tr. 171).  Dr. Stringer noted that Plaintiff's neck showed some evidence of paracervical muscle spasm and was moderately limited

---

[8]Plaintiff's DIB application indicates that he stopped working on December 26, 2001, due to a work-related injury and suffered an injury in an automobile accident that occurred on February 6, 2002 (*see* Tr. 43, 46).  Thus, it appears that Dr. Stringer's notation regarding Plaintiff's work-history is erroneous (*see id.*).

in flexion and extension secondary to pain (*id.*). Motor examination showed normal upper and lower extremity strength, including normal grip (Tr. 170). Sensory examination revealed decreased appreciation of sensation to pinprick involving Plaintiff's right hand (*id.*). Gait was normal (*id.*). Dr. Stringer prescribed Tylenol 3 (*id.*).

On November 22, 2004, Plaintiff returned to Dr. Stringer (Tr. 169). Dr. Stringer noted that his neck showed marked tenderness in the cervical spine and both trapezius, "myofascitis, [and] limitation of neck movement to [fifty percent] of normal" (*id.*). Motor examination showed left upper extremity strength at 4/5 deltoids, 4/5 biceps, 4/5 wrist flexors and extenders, and 4/5 grip; and right upper extremity strength at 3+/5 deltoids, 3+/5 biceps, 3+/5 wrist flexors and extenders, and 3+/5 grip (*id.*). Lower extremity strength was 4/5 in all areas (*id.*). Sensory examination showed spotty loss of sensation to pinprick over Plaintiff's right upper extremity (*id.*). Gait was normal (*id.*). Dr. Stringer's impression remained unchanged (Tr. 168). He noted that MRI scans had not been approved, and he prescribed Lortab 10 (*id.*).

On December 29, 2004, Plaintiff presented to Dr. Stringer for follow-up (*id.*). Dr. Stringer noted that Plaintiff "remains off work" (*id.*). Examination of Plaintiff's neck revealed some evidence of paracervical muscle spasm and moderate limitation of neck flexion and extension secondary to pain (Tr. 167). Upper and lower extremity strength, including grip strength, was normal (*id.*). Sensory examination showed upper and lower extremities intact to pinprick (*id.*). Dr. Stringer's impression remained unchanged (*id.*).

On April 6, 2005, Plaintiff was examined by Leo Chen, M.D., an orthopedic surgeon, at the request of the ALJ (Tr. 158–59; *see* Tr. 90 (ALJ's request)). Dr. Chen described Plaintiff as "an active 52 year old right hand dominant male" whose symptoms began after a February 2002 automobile accident (Tr. 158). Dr. Chen noted that Plaintiff complained of pain in his neck and back with numbness and tingling in both his right upper and lower extremities (*id.*). Plaintiff did not complain of pain on his left side (*id.*). Dr. Chen also remarked that Plaintiff has not had surgery because he is uninsured (*id.*). Dr. Chen noted that Plaintiff last worked laying concrete in 2002, does not use an assistive device to ambulate, and drives occasionally (*id.*). He has been treated with physical therapy and epidural steroid injections in his back (*id.*). Dr. Chen also noted Plaintiff's reports that he is unable to sit, stand, or lie down for any length of time due to his back and neck

pain (*id.*).  Dr. Chen reviewed Plaintiff's x-rays and noted that they revealed "significant spurring and narrowing of the C5-6 and C6-7 disc area" (*id.*).  Plaintiff has lost his normal kyphosis and there is "significant spurring and osteophytes in this area" but not significant subluxation (*id.*).  No acute bony injuries were noted (*id.*).  Left spine views showed mild degenerative change with narrowing at the L3-4 disc space and early spurring (*id.*).  "Otherwise, the other disc spaces look fairly well maintained in his lumbosacral spine . . . [with no] acute bony injury in his C or his L spine" (*id.*).  On physical examination, Dr. Chen remarked that Plaintiff's neck was "[s]upple" (Tr. 159).  Dr. Chen noted a limited range of motion in Plaintiff's cervical spine but a full range of motion in his lumbar spine and extremities (*id.*).  Dr. Chen recorded the following range of motion limitations: right cervical spine — fifty degrees forward flexion, thirty degrees extension and lateral flexion, and full rotation (Tr. 160).  Dr. Chen made no notations regarding Plaintiff's left cervical spine except to indicate that he has full rotation on the left (*id.*).  Right and left lumbar spine, shoulder, elbow, wrist, hand, hip, knee, ankle, and great toe rotation were noted as "full" (Tr. 160–62).  Dr. Chen also assessed Plaintiff's ability to do work-related activities and found he could lift and carry up to ten pounds continuously, eleven to twenty and twenty-one to fifty pounds frequently,[9] and 51 to 100 pounds occasionally[10] (Tr. 163).  He further opined that Plaintiff can sit six hours, stand four hours, and walk three hours in an eight-hour workday (Tr. 164).  He can also sit four hours, stand two hours, and walk one hour without interruption (*id.*).  Dr. Chen found that Plaintiff's hands and feet were unaffected and he could continuously use both his right and left hands and feet (*id.*).  He can climb, balance, stoop, crouch, kneel, and crawl frequently (Tr. 165).  He can reach, and push or pull frequently, and he can continuously handle, feel, hear, and speak (*id.*).  Dr. Chen noted no environmental restrictions (Tr. 166).  Dr. Chen found that Plaintiff  was "unable to toe walk." (Tr. 159).  Sensation was "grossly intact in bilateral lower extremities" (*id.*).  Straight leg raising "on the right is positive about 70 degrees seated and supine, negative on the left" (*id.*).  No other signs of joint inflammation or redness were noted (*id.*).  No significant paravertebral muscle spasm was

---

[9]"Frequently" means occurring 1/3rd to 2/3rds of an eight-hour workday (cumulative, not continuous).

[10]"Occasionally" means occurring from very little, up to 1/3rd of an eight-hour workday (cumulative, not continuous).

noted (*id.*).  "Grip strength is about 4+/5 on the right" (*id.*).  Plaintiff was able to unbutton his shirt and open a door knob (*id.*).  Dr. Chen noted no other gross motor deficits (*id.*).  Dr. Chen's assessment was "[l]ow back pain," "[c]ervical pain," "C5-6 and C6-7 cervical spondylosis," and "[e]arly lumbar L3-4 spondylosis" (*id.*).  Dr. Chen opined that Plaintiff "would have some limitation of his ability to perform work-related physical activity" (*id.*).

On April 20, 2005, Plaintiff returned to Dr. Stringer for follow-up (Tr. 172).  Dr. Stringer noted that his neck showed "marked tenderness to palpation in the mid and lower cervical spine area, and both trapezius, moderate muscle spasm, [and] limitation of neck movement to [fifty percent] of normal" (Tr. 173).  Dr. Stringer noted "moderate to severe tenderness to palpation in the mid and lower lumbar area, moderate to severe muscle spasm, [and] limitation of forward bending to 70 [percent] of normal" (*id.*).  Straight leg raising caused pain in Plaintiff's back and down both legs (*id.*).  Motor examination showed upper extremity strength, deltoids 4+/5, biceps 4+/5, triceps 4+/5, wrist flexors 4+/5, wrist extenders 4+/5, hamstrings 4+/5, dorsiflexion 4+/5, and plantar flexion 4+/5 (Tr. 172).  Sensory examination showed spotty loss of sensation to pinprick over his arms, hands, and legs, and feet "in stocking-glove distribution" (*id.*).  Dr. Stringer noted "[g]ait-limping gait" (*id.*).  Dr. Stringer prescribed Lortab 5 (*id.*).

C.      Other Information Within Plaintiff's Claim File

J. Patrick Neal, a Board Certified General Surgeon, completed a Physical RFC Assessment on June 8, 2004 (Tr. 150–57).  He opined that Plaintiff was able to occasionally lift or carry up to twenty pounds and frequently lift or carry up to ten pounds; he could stand, walk, or sit six hours in an eight-hour workday (Tr. 151).  His ability to push or pull was unlimited (*id.*).  Plaintiff was occasionally able to climb on ladders, rope, or scaffolds; occasionally able to stoop, kneel, crouch, and crawl; and frequently able to balance and climb ramps and stairs (Tr. 152).  Additionally, Plaintiff had no established visual, communicative, or environmental limitations, but he was occasionally limited in his ability to reach overhead with his right arm; other manipulative abilities were unlimited (Tr. 153–54).

A second consulting physician completed a Physical RFC Assessment (Tr. 95–101).  He or she opined that Plaintiff was able to occasionally lift or carry up to twenty pounds and frequently lift or carry up to ten pounds; he could stand, walk, or sit six hours in an eight-hour workday (Tr.

96).  His ability to push or pull was unlimited (*id.*).  No postural, visual, or communicative limitations were established (Tr. 97–99).  The second physician further opined that Plaintiff is occasionally limited in the right arm in his ability to reach in all directions, handling gross manipulation, and feeling skin receptors, but he is unlimited in finger manipulation (Tr. 98).  Additionally, Plaintiff should avoid moderate exposure to extreme cold, heat, wetness, humidity, and vibration, as well as hazardous machinery and heights, but he had no limitations in being exposed to noise or fumes, odors, dusts, gases, or poor ventilation (Tr. 99).

Finally, a vocational expert ("VE") testified at Plaintiff's hearing before the ALJ.  Gail Jarrol, the VE, testified that Plaintiff's past work was "pretty heavy," and Plaintiff could not engage in his prior employment (Tr. 207).  Considering an individual similar in age, education, and experience as Plaintiff that would be limited to light unskilled or semi-skilled work with "a sit/stand option," the VE opined that Plaintiff would be able to perform unskilled sedentary work as a parking lot attendant with about 42,283 available jobs in the United States and 3,183 jobs in Florida (*id.*).  The VE also opined Plaintiff would be able to perform unskilled light work as a bench assembler with about 54,827 available jobs in the United States and 1,600 jobs in Florida (Tr. 208).  Further, the VE opined Plaintiff could perform unskilled light work as an automatic photo finisher with about 90,000 available jobs in the United States and 6,335 jobs in Florida (*id.*).  At the semi-skilled level, the VE opined Plaintiff could perform light work as a companion with 233,000 available jobs in the United States and 8,500 jobs in Florida (*id.*).  Finally, the VE testified that Plaintiff could perform semi-skilled light work as a teacher's aid with 926,000 available jobs in the United States and 43,600 jobs in Florida (*id.*).

V.      DISCUSSION

Plaintiff raises three issues on appeal, (1) the ALJ failed to properly consider Dr. Neal's opinion, (2) the ALJ failed to consider Plaintiff's subjective complaints of pain and did not properly apply the Eleventh Circuit pain standard, and (3) the ALJ improperly relied on the VE's testimony that Plaintiff could perform work at the semi-skilled level and improperly framed the hypothetical question presented to the VE (Doc. 10 at 7–17).

A.      Dr. Neal's Opinion

Plaintiff argues that the ALJ "without any explanation and without even acknowledging the contrary part of the physician's opinion — failed to adopt Dr. [] Neal's opinion that [Plaintiff] was limited to occasionally reaching with his right upper extremity" and thus erred in failing to properly consider Dr. Neal's opinion (*id.* at 7) (emphasis removed).  The Commissioner argues that the ALJ gave proper weight to Dr. Neal's opinion (Doc. 13 at 3–6).  First, the Commissioner argues that Dr. Neal's opinion was actually that Plaintiff was limited to only occasional "<u>overhead</u> reaching" with the right upper extremity (*id.* at 4) (emphasis in original).  Furthermore, the Commissioner argues that Dr. Neal is a non-examining physician, and thus his opinion is entitled to less weight than the opinions of Plaintiff's treating physicians (*id.* at 4–5).[11]

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* <u>Lewis</u>, 125 F.3d at 1439–41; <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991);  <u>Sabo v. Commissioner of Social Security</u>,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* <u>Edwards</u>, 937 F.2d 580

---

[11]The court also acknowledges that the Commissioner "points out that [Plaintiff's] general argument [as to Dr. Neal] is curious, as the opinion of the State non-examining doctor[] resulted in findings of non-disability at the earlier stages before the agency' (Doc. 13 at 3).  The court concurs with the Commissioner's statement that "[h]ow [this] opinion[] would now support an allegation of disability is not clearly explained" (*id.*).

(finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).   Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).   When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e).  The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims.   The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.   For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  20 C.F.R.

§ 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.  SSR 96-5p.  In Lewis, 125 F.3d at 1441 (11th Cir. 1997), the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled.  To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters.  Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters.  These things are not properly considered by the Commissioner in determining disability.  20 C.F.R. § 404.1566.  For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

Finally, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

In the instant case, the ALJ determined that the "medical evidence [] indicates that [Plaintiff] has neck and back pain, and status post surgery and pain in the right thumb" (Tr. 15).  The ALJ

found these impairments to be severe but not " 'severe' enough to meet or medically equal, either singly or in combination[,] one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4" (*id.*).  In reaching this conclusion, the ALJ reviewed Dr. Stringer's opinion and records in detail and cited to Dr. Chen's consultative opinion (Tr. 14–16).  The ALJ explained that "Dr. Stringer opined that [Plaintiff] would not be able to return to his past construction work" but found "[t]his assessment would not preclude [Plaintiff] from doing other types of work" (Tr. 16).  The ALJ also cited to Dr. Chen's consultive examination of Plaintiff (*id.*).  The ALJ reported that Dr. Chen found Plaintiff "did not have significant paravertebral muscle spasm" and noted Plaintiff "would have some limitation in his ability to perform work-related physical activity . . . [but he] did not indicate that [Plaintiff] could not work" (*id.*).  In fact, the ALJ noted, Dr. Chen opined that Plaintiff could sit six hours, stand four hours, and walk three hours in an eight-hour work day (*id.*).  Finally, the ALJ noted that the "state agency medical consultant [(Dr. Neal)] concluded that [Plaintiff] had the residual functional capacity to do light work" (*id.*).  The ALJ considered Dr. Neal's opinion to support those of Dr. Stringer and Dr. Chen (*id.*).  Accordingly, the ALJ found Plaintiff had the RFC to do "light work with a sit/stand option" (*id.*).[12]

Residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.  *See* Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite his limitations.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC."  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the RFC determination is a medical question, it is not based only on "medical" evidence (that is, evidence from medical reports or sources); rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record.  *See* Phillips v. Barnhart, 357 F.3d

---

[12]Light work is defined in 20 C.F.R. § 404.1567(b) as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

1232, 1238 (11th Cir. 2004); <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); <u>Dykes v. Apfel</u>, 223 F.3d 865, 866–67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical evidence that supports the RFC finding). *See also* 20 C.F.R. § 404.1545; Social Security Ruling (SSR) 96-8p.

Plaintiff faults the ALJ for failing to adopt Dr. Neal's opinion that Plaintiff was limited in his ability to reach in all directions (Doc. 10 at 7).  Plaintiff does not say, and it is not apparent, what impact, if any, this opinion would have on the ALJ's findings with respect to whether Plaintiff could perform light work with a sit/stand option.  Although the ALJ is "bound to make every reasonable effort to obtain from the claimant's treating physician(s) all the medical evidence necessary to make a determination," the burden is on Plaintiff to prove that he is disabled.  *See* <u>Sellers v. Barnhart</u>, 246 F. Supp. 2d 1201, 1210 (M.D. Ala. 2002).

Initially, the court notes that Dr. Neal was a consulting physician; thus, his opinion is not entitled to as much weight as that of a treating physician.  *See* <u>Wilson</u>, 734 F.2d at 518; 20 C.F.R. § 404.1527(d).  Even still, Dr. Neal's opinions do not lead to the conclusion that Plaintiff was disabled and incapable of performing the work suggested by the Commissioner.  A review of the record shows that Dr. Neal opined that Plaintiff was able to occasionally lift or carry up to twenty pounds and frequently lift or carry up to ten pounds, and he could stand, walk, or sit six hours in an eight-hour workday (Tr. 151).  He further opined that Plaintiff's ability to push or pull was unlimited (*id.*).  Plaintiff was occasionally able to climb ladders, ropes, or scaffolds; occasionally able to stoop, kneel, crouch and crawl; and frequently able to balance and climb ramps and stairs (Tr. 152).  As discussed further *infra*, Dr. Neal noted some limitation with Plaintiff's ability to reach <u>overhead</u> with his right arm (he did not, as Plaintiff has suggested, limit Plaintiff to "occasionally reaching with his right upper extremity" (*compare* Doc. 10 at 7, *with* Tr. 151, 153)), but otherwise he found Plaintiff could reach in all directions, push and pull, and had no other manipulative limitations (*see* Tr. 151, 153).  Thus, Dr. Neal's opinion appears to <u>support</u> the ALJ's determination that Plaintiff was capable of performing light work, as it is defined in 20 C.F.R. § 404.1567(b) (*see supra* p. 23 n.12).

Moreover, the ALJ specifically cited to Dr. Neal's RFC as supportive of Dr. Stringer's and Dr. Chen's opinions that Plaintiff was not disabled because he was capable of performing the full range of light work (Tr. 16).  The ALJ's conclusion is well supported by the record.

A second consulting physician found the same exertional limitations identified by Dr. Neal (*compare* Tr. 151, *with* Tr. 96).  But unlike Dr. Neal, the second physician did not establish any postural limitations (*compare* Tr. 152, *with* Tr. 97).  With respect to Plaintiff's manipulative limitations, the second physician found Plaintiff to be occasionally limited in his right arm in reaching in all directions, as well as handling and feeling; whereas Dr. Neal established manipulative limitations only with respect to Plaintiff's ability to reach <u>overhead</u> with his right arm (*compare* Tr. 153, *with* Tr. 98).  The second physician noted that Plaintiff's "right arm is only limited to occasionally . . . due to cervical root compression" (Tr. 98).  Dr. Neal made the same comment in limiting Plaintiff to only occasional overhead reaching with his right arm (*see* Tr. 153 (specifically, Dr. Neal wrote "but overhead reaching with RUE [(right upper extremity)] to OCL [(occasionally)]")).  Although the second physician established greater limitations than Dr. Neal, his or her opinion still supports the ALJ's conclusion that Plaintiff was capable of performing light work.

Additionally, the record also supports the ALJ's conclusion.  For example, Dr. Stringer's multiple examinations of Plaintiff consistently showed that he had normal upper extremity strength and no problems with his lower extremity strength (*see, e.g.*, Tr.102–03, 104, 106, 109, 112, 118, 121, 124, 126, 128, 130, 136, 140, 169, 172).  Plaintiff's grip strength was also consistently normal (*see, e.g.*, Tr. 102–03, 111, 115, 116, 118, 121, 124, 125, 127, 130, 139, 148, 167, 170).  Furthermore, the court notes that from March 2002 until July 2002, Plaintiff complained of pain in his <u>left side</u> as opposed to his present complaints of pain on his right side (*see* Tr. 141–49 (Dr. Nichols's records),  128–45 (Dr. Stringer's records); 43, 46 (at the hearing before the ALJ Plaintiff alleged injury and pain on his right), 55–56 (a disability report also alleged injury on his right)).  AT first,  in June and July 2002, Dr. Stringer indicated that Plaintiff should have surgery, but in mid-July 2002, he noted that Plaintiff was informed he could not schedule surgery because his insurance coverage was exhausted (*see* Tr. 136, 128).  Plaintiff did not return to Dr. Stringer until December 2002, and when he returned, he complained of pain on his <u>right side</u> (*see* Tr. 128).  Dr. Stringer

continued to recommend surgery, but it is not at all clear that this surgery was to repair a defect in Plaintiff's right extremity because all of the prior records indicated that Plaintiff sustained an injury and had pain on his left side (*see* Tr. 141–49 (complaints of left arm and left side pain), 140 (left arm and hand pain), 136 (pain worse on left), 133 (a cervical myelogram showed C4-5 mild posterior osteophyte formation slightly greater on the left and axillary sleeves blunted on the left), 130 (noting Plaintiff's complaints of pain being "worse on the left")).  In addition, Dr. Stringer's subsequent records, although indicating a desire to continue with surgery, show that he prescribed pain medication to remedy Plaintiff's complaints of pain on the right (*see* Tr. 121, 119, 113, 109, 106, 102, 170, 168, 172).

The ALJ's determination is also supported by Dr. Chen's opinion.  Dr. Chen assessed Plaintiff's ability to do work-related activities and found he could lift and carry up to ten pounds continuously, eleven to twenty and twenty-one to fifty pounds frequently, and 51 to 100 pounds occasionally (Tr. 163).  He can sit six hours, stand four hours, and walk three hours in an eight-hour workday (Tr. 164).  He can also sit four hours, stand two hours, and walk one hour without interruption (*id.*).  Dr. Chen found that Plaintiff's hands and feet were unaffected, and he could continuously use both his right and left hands and feet (*id.*).  He can frequently climb, balance, stoop, crouch, kneel, and crawl (Tr. 165).  He can frequently reach, push, and pull, and continuously handle, feel, hear, and speak (*id.*).  Dr. Chen also reported that Plaintiff's grip strength was normal (Tr. 159).  Dr. Chen's opinion shows that Plaintiff may have had even fewer limitations that those established in Dr. Stringer's and Dr. Neal's opinions.  Still, the ALJ read the opinions of Drs. Stringer and Chen as indicating that Plaintiff could at least perform the full range of light work.

In addition, Plaintiff's own testimony is consistent with the ALJ's findings.  Regarding his physical limitations, Plaintiff testified that he cannot lift much over fifteen to twenty pounds, which, like the opinions of the consulting physicians and Dr. Chen, is consistent with the definition of light work (Tr. 203).  Finally, the ALJ asked Plaintiff if he could do lighter work and Plaintiff answered "I probably could" (Tr. 206).

Therefore, the ALJ's determination that Plaintiff could perform the full range of light work is supported by substantial record evidence.  *See* Sellers v. Barnhart, 246 F.Supp.2d 1201, 1210 (M.D. Ala. 2002) (noting that the burden is on the Plaintiff to prove that he is disabled); *see also*

Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (citing Brown v. Chater, 87 F.3d 963, 964-965 (8th Cir.1996) (lack of significant restrictions imposed by treating physicians supported ALJ's finding of no disability)).

Moreover, even if the court fully accepted Plaintiff's argument that the ALJ should have adopted Dr. Neal's opinion regarding Plaintiff's manipulative limitations, Dr. Neal's opinion would not undermine the ALJ's determination.  Dr. Neal's limitation of Plaintiff to only occasionally reaching overhead with his right upper extremity still fits within the definition of light work.  *See* 20 C.F.R. § 404.1567(b).  Thus, not only is Dr. Neal's opinion entitled to less evidentiary weight, it appears to support the ALJ's ultimate conclusion that Plaintiff was capable of performing light work.  *See* Wilson, 734 F.2d at 518; 20 C.F.R. § 404.1527(d).  For the foregoing reasons, the undersigned concludes the ALJ properly considered the opinions of the treating, examining, and consulting physicians, and substantial evidence exists in the record to support the ALJ's RFC conclusion.

B.      Eleventh Circuit Pain Standard

Plaintiff argues that the ALJ failed to properly apply the Eleventh Circuit's three-part pain standard (Doc. 10 at 11–13).  First, Plaintiff asserts that the ALJ failed to cite to Eleventh Circuit case law (*id.* at 12).  Second, Plaintiff argues that the ALJ improperly discounted Plaintiff's subjective complaints of pain (*id.* at 12–13).  In response, the Commissioner asserts that the ALJ properly identified the pain standard set out in 20 C.F.R. §§ 404.1529 and 416.929 (Doc. 13 at 6–7).  The Commissioner also urges the court to find that the ALJ properly discounted Plaintiff's subjective complaints and that the ALJ's decision is substantially supported by the record (*id.* at 7–9).

Pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, "unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  *Accord* 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be
> objective medical evidence to confirm the severity of the alleged pain arising from
> the condition or (2) the objectively determined medical condition must be of a
> severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th

Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921

F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin

v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991); Landry v. Heckler, 782 F.2d 1551,

1553 (11th Cir. 1986).

      The Eleventh Circuit has also approved an ALJ's reference to and application of the standard

set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the

subjective pain testimony that this court interpreted when initially establishing its three-part

standard."  Wilson, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not

reversible error so long as the ALJ applies the appropriate regulation.

      But "[w]hile both the Regulations and the Hand standard require objective medical evidence

of a condition that could reasonably be expected to cause the pain alleged, neither requires objective

proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be

disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957

F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)).

However, the absence of evidence to support symptoms of the severity claimed is a factor that can

be considered.  Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

      Finally, "[I]f the Commissioner refuses to credit [subjective testimony of the Plaintiff

concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to

do so we hold as a matter of law that he has accepted that testimony as true."  MacGregor v. Bowen,

786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an

explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The

credibility determination does not need to cite particular phrases or formulations but it cannot merely

be a broad rejection which is not enough to enable [the district court or this Court] to conclude that

[the ALJ] considered [plaintiff's] medical condition as a whole."  Dyer v. Barnhart, 395 F.3d 1206,

1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for

disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Dep't. of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain."  Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[13]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, 761 F.2d at 1548–49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In the instant case, Plaintiff argues that the ALJ failed to apply the Eleventh Circuit's three-part pain standard (Doc. 10 at 11–13).  In particular, Plaintiff argues "the ALJ did not even mention the Eleventh Circuit pain standard" (id. at 12).  Plaintiff is mistaken.  Although the ALJ did not specifically cite the Eleventh Circuit pain standard, he referred to and applied 20 C.F.R. § 404.1529 in addressing Plaintiff's subjective complaints (Tr. 15–16); thus, the ALJ did not err.  See Wilson, 284 F.3d at 1226.  Moreover, if the ALJ's findings of fact "leave no doubt as to the appropriate result" under the standard, the fact that the ALJ does not explicitly refer to the standard is of no consequence. See Landry, 782 F.2d at 1553–54.  Here, as in Landry, the ALJ's findings of fact leave no doubt as to the appropriate result under the Eleventh Circuit standard.

_____

[13]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

First, the ALJ found evidence of an underlying medical condition; namely, the ALJ acknowledged that "[t]he medical evidence [] indicates that the claimant has neck and back pain, and status post surgery and pain in the right thumb" (Tr. 15).  The ALJ also found these impairments to be "severe" within the meaning of the Act (*id.*).

Second, the ALJ concluded that Plaintiff's subjective complaints were not fully credible, and his symptoms were not as limiting as he alleged (Tr. 15–16).  The ALJ went on to find that "[d]espite [Plaintiff's] allegations of incapacitating back pain, his doctor indicated that he would be able to return to work within [six] weeks following back surgery" (*id.*).  The ALJ noted that "[n]o treating or examining physician has said [Plaintiff] is completely unable to work" (Tr. 16).

The ALJ may properly find subjective complaints of pain not credible if he articulates reasons that are supported by the record.  *See* Jones, 941 F.2d at 1532.  Here, in support of his findings, the ALJ cited to the records of Dr. Stringer (Tr. 15–16).  The ALJ concluded that, although "Dr. Stringer opined that [Plaintiff] would not be able to return to his past construction work[, this] assessment would not preclude [Plaintiff] from doing other types of work" (Tr. 16).  The record supports this conclusion.  Dr. Stringer consistently reported that Plaintiff had normal upper and lower extremity strength and normal grip strength (*see, e.g.*, Tr.102–03, 104, 106, 109, 111–12, 115–16, 118, 121, 124–28, 130, 136, 139–40, 167, 169–70, 172).  Dr. Stringer also often reported that Plaintiff's neck showed no or only some evidence of paracervical muscle spasm (*see* Tr. 102, 109, 111, 117, 118, 127, 167, 171).  Dr. Stringer also consistently recorded only moderate limitation of neck flexion and extension, occasionally with a fifty-percent range of motion limitation, and only once with a limitation rating of severe but still with fifty-percent of the normal range of motion (*see* Tr. 103, 108, 110, 116, 118, 122 (fifty-percent range of motion limitation on neck motion), 124, 126, 167, 169 (same); *see also* Tr. 172 (severe limitation but still with fifty-percent neck range of motion)).  From March 2002 until July 2002, Plaintiff complained of pain in his left-side as opposed his right-side (*see* Tr. 141–49 (Dr. Nichols's records), 128–45 (Dr. Stringer's records)).  Dr. Stringer's records do not explain why Plaintiff began to complain of pain on his right side as opposed to his left, nor do Dr. Stringer's records explain if the surgery he was recommending would affect  Plaintiff's subsequent allegations of pain on his right side.  Indeed, the record indicates that at the time Dr. Stringer initially determined that Plaintiff would benefit from surgery in June and

July 2002 (Tr. 136, 128), Plaintiff's complaints of pain primarily concerned his left side (*see* Tr. 141–49, 140, 136, 133, 130).  Beginning in December 2002, it was often Dr. Stringer's impression that Plaintiff was in some "neck pain" or "right arm pain," and he still opined that Plaintiff needed surgery (*see* Tr. 110–11, 113, 117, 121, 126, 128).  However, while Dr. Stringer reported that Plaintiff "is unable to return to work in the construction industry due to his symptomatology," Dr. Stringer was of the opinion that Plaintiff "should be able to return to work at light duty" approximately six weeks post-surgery (Tr. 128; *see* Tr. 125 (same)).[14]  In the meantime, and for the next twenty-five months, Dr. Stringer continued to treat Plaintiff with pain-management medication for complaints of right arm and hand pain with full knowledge that Plaintiff's insurer(s) would not approve surgery (*see* Tr. 136 (initially noting Plaintiff's desire to proceed with surgery and prescribing Lortab 10 and Flexeril with instructions "not to take [] medicine while he is driving or working"), 125 (noting that surgery had not been authorized), 128 (no surgery authorized), 121 (prescribing Lortab 10 and again instructing Plaintiff "not to take any medicine while he is driving or working"), 119 (prescribing Lortab 10), 117 (prescribing Tylenol 3), 113 (no surgery authorized, prescribing Lortab 5), 109 (no surgery authorized, prescribing Tylenol 3), 106 (no surgery authorized, prescribing Lortab 7.5), 102 (no surgery authorized, prescribing Tylenol 3), 170 (prescribing Tylenol 3), 168 (MRI's not authorized, prescribing Lortab 10), 172 (prescribing Lortab 5)).  Furthermore, Dr. Stringer's records also show that prior to June/July 2002, Plaintiff's trigger point injection treatments were well tolerated by Plaintiff and resulted in the improvement of his condition (*see* Tr. 136, 140, 145).  On the basis of this evidence, the ALJ found that Plaintiff's "condition has been managed with medication, injections[,] and therapy" (Tr. at 16).  Thus, the ALJ concluded that Dr. Stringer did not opine that Plaintiff was in disabling pain (*see* Tr. 15–16).  "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." <u>Dawkins v. Bowen</u>, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting <u>Lovelace v. Bowen</u>, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted)).  Thus, the ALJ's conclusion that Plaintiff's

---

[14]The court notes that Dr. Stringer made these comments while also attempting to gain approval for Plaintiff's surgery from vocational rehabilitation (*see* Tr. 125, 128).  Dr. Stringer, however, never opined that Plaintiff would be disabled if he was not approved for surgery.

condition was successfully treated through medication, trigger point injections, and therapy is well supported by Dr. Stringer's records.[15]

Furthermore, in support of his conclusion that Plaintiff was not in disabling pain and could return to work the ALJ also cited to Dr. Chen's opinion (Tr. 16). Dr. Chen noted that Plaintiff does not use an assistive device to ambulate and drives occasionally (Tr. 158). Dr. Chen also noted Plaintiff's treatment with physical therapy and epidural steroid injections (*id.*). On physical examination, Dr. Chen remarked that Plaintiff's neck was "[s]upple" (Tr. 159). Dr. Chen noted only fifty-degrees of forward flexion and thirty-degrees of extension and lateral flexion in Plaintiff's right cervical spine but full range of motion in his right and left lumbar spine and extremities (*see* Tr. 159–60). Dr. Chen did not record any other rotational limitations (*id.*). No significant paravertebral muscle spasms were noted (Tr. 159). Plaintiff had normal grip strength and was able to unbutton his shirt and open a door knob (*id.*). Dr. Chen's assessment was "[l]ow back pain," "[c]ervical pain," "C5-6 and C6-7 cervical spondylosis," and "[e]arly lumbar L3-4 spondylosis" (*id.*). Dr. Chen opined that Plaintiff "would have some limitation of his ability to perform work related physical activity" (*id.*). Dr. Chen did not find Plaintiff to be in disabling pain.

Finally, Plaintiff's own testimony is inconsistent with his complaints of significant pain. Plaintiff testified that he has attempted to find employment but has been unable to retain a job (Tr. 205). The ALJ also asked Plaintiff if he could do lighter work and Plaintiff answered "I probably could" (Tr. 206). Plaintiff's desire to return to work is inconsistent with disability and indicates that he did not view his pain as disabling. *See* Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).

---

[15]The ALJ did not rely on Plaintiff's failure to have surgery to find that Plaintiff was not in disabling pain. *Cf.* Dawkins, 848 F.2d at 1213 (explaining that poverty excuses non-compliance with recommended treatment); Lovelace, 813 F.2d at 59 ("To a poor person, a medicine that he cannot afford to buy does not exist"); Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986) (failure to follow prescribed treatment does not preclude reaching the conclusion that a claimant is disabled when the failure is justified by lack of funds); Dover v. Bowen, 784 F.2d 335, 337 (8th Cir. 1986) (noting that "the ALJ must consider a claimant's allegation that he has not sought treatment or used medications because of lack of finances"); Teter v. Heckler, 775 F.2d 1104, 1107 (10th Cir. 1985) (inability to afford surgery does not constitute an unjustified refusal and does not preclude recovery of disability benefits). In this case, Plaintiff does not argue that he failed to seek a necessary treatment because of his inability to pay for the procedure. Indeed, a review of Dr. Stringer's records, *see supra*, revealed that while Dr. Stringer recommended surgery and opined that Plaintiff could also return to work after surgery, Dr. Stringer continued to successfully treat Plaintiff with pain-management medications for the next twenty-five months, and he never opined that Plaintiff was unable to return to work without surgery. Thus, the ALJ's conclusion that, Dr. Stringer did not opine that Plaintiff was in disabling pain, is consistent with Dr. Stringer's records, including Dr. Stringer's opinion that Plaintiff could also benefit from surgery.

Accordingly, the ALJ properly discounted Plaintiff's subjective complaints and articulated sufficient reasons, supported by the record, for doing so.

C.    Vocational Expert Testimony

Plaintiff argues that the ALJ improperly relied on the VE's testimony that Plaintiff could perform work at the <u>semi-skilled</u> level because the ALJ failed to make any findings as to Plaintiff's transferable work skills (*id.* at 14–15).  In addition, Plaintiff claims the ALJ failed to properly frame a hypothetical question for the VE because the ALJ's hypothetical question did not include upper extremity limitations or take into account Plaintiff's allegations of pain (*id.* at 16–17).  In particular, Plaintiff alleges that all four of the occupations cited by the VE require frequent reaching, but Plaintiff was limited to only occasional reaching  (*id.* at 16).  Finally, Plaintiff alleges that "as a 52 year old, even if [Plaintiff] can perform sedentary work and is NOT completely incapacitated, the regulations provide that such a person is [automatically] disabled if the educational and vocational characteristics are consistent with the Grids" (*id.* at 11–12, n.4).

Responding to Plaintiff's arguments, the Commissioner concedes that the ALJ "should not have found that Plaintiff could perform <u>semi-skilled</u> jobs as 'other' work without a finding as to transferable work skills" (Doc. 13 at 10) (emphasis supplied).  This error, however, is harmless because the VE also identified three <u>unskilled</u> jobs that Plaintiff could perform (*id.*).  Therefore, the Commissioner concludes, the ALJ's error does not warrant reversal (*id.* at 10–11).  Regarding the hypothetical question, the Commissioner argues that the ALJ properly considered Plaintiff's RFC and limitations when posing the hypothetical question to the VE (*id.* at 11).  Next, the Commissioner argues that the ALJ's determination that Plaintiff could perform light work is substantially supported by the record (*id.* at 11–12).  Thus, the Commissioner opines, to the extent Plaintiff alleges he is "automatically" disabled as a 50 year-old limited to sedentary work, the Grids may be used as a "guide or <u>framework</u>" if supplemented by VE testimony and evidence meeting the Commissioner's burden of showing that work exists in the national economy that Plaintiff is capable of performing (*see id.*).  The Commissioner argues that this burden has been met through the VE's testimony (*id.*).  Furthermore, the Commissioner argues that there is no medical support in the record for restricting Plaintiff to lifting only ten pounds (a requirement for use of the sedentary medical-vocational guideline cited by Plaintiff) (*id.* at 12).

In the instant case, the ALJ found that Plaintiff could do unskilled <u>or</u> semi-skilled work (Tr. 16). The ALJ also found that Plaintiff had no transferable skills and/or transferable skills were not an issue in this case (Tr. 17). The Commissioner concedes that the ALJ erred by failing to make a finding regarding transferable skills but contends this error was harmless because the ALJ also found that Plaintiff could perform <u>unskilled</u> work and transferability of skills is an issue only for <u>semi-skilled</u> work (Doc. 13 at 10). Thus, if the ALJ's determination that Plaintiff could perform <u>unskilled</u> work is supported by substantial evidence, the ALJ's determination can be affirmed notwithstanding this error, as misstatements by an ALJ can constitute harmless error. *See* <u>Diorio v. Heckler</u>, 721 F.2d 726, 728 (11th Cir. 1983) (misstatements harmless where ALJ applied correct legal standard despite the first misstatement, and the second misstatement was irrelevant); *see also* <u>East v. Barnhart</u>, 197 Fed. Appx. 899, 901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination); <u>Pichette v. Barnhart</u>, 185 Fed. Appx. 855, 856 (11th Cir. 2006) (ALJ's erroneous statements found to be harmless where ALJ applied proper legal standard).

Here, the ALJ determined, based on the testimony of the VE, that Plaintiff could perform unskilled work as a parking lot attendant or bench assembler (Tr. 17–18). First, the VE testified that Plaintiff could not engage in his prior employment (Tr. 207). Next, considering an individual similar in age, education, and experience as Plaintiff that would be limited to light unskilled or semi-skilled work with "a sit/stand option," the VE opined Plaintiff would be able to perform unskilled sedentary work as a parking lot attendant, and unskilled light work as a bench assembler and automatic photo finisher, and that such jobs were available in significant numbers (Tr. 207–08). Thus, there were three unskilled jobs that Plaintiff could perform without regard to the issue of transferability of work skills, and error committed by the ALJ is regarding skilled work is harmless. When an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will stand. *See* <u>Diorio</u>, 721 at 728. *See also* <u>Clay v. Barnhart</u>, 417 F.3d 922, 931 (8th Cir. 2005) (even if conclusion that claimant could work as a cashier was inconsistent with hypothetical and the Dictionary of Occupational Titles, it did not demonstrate that claimant was entitled to benefits, where cashier was not the only job that expert found she could perform).

Plaintiff further complains that the ALJ should have included his "upper extremity limitations" and allegations of pain in the hypothetical question presented to the VE (Doc. 10 at 16–17).  A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).  However, the ALJ is not required to include findings in the hypothetical that he has properly rejected as unsupported.  See McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

In the instant case, as previously discussed, the ALJ properly discounted Plaintiff's subjective complaints and thus was not required to include them in the hypothetical question presented to the VE.  Furthermore, Plaintiff's complaints of upper extremity limitations were properly considered by the ALJ in determining Plaintiff's RFC.  As has already been discussed extensively, the ALJ properly calculated Plaintiff's RFC based on substantial record evidence.  Specifically regarding Plaintiff's argument with respect to his reaching ability, Plaintiff contends that the ALJ should have included the limitation that Plaintiff "was limited to occasional reaching" in the hypothetical presented to the VE (Doc. 10 at 16).  The ALJ, however, considered one consulting physician's opinion that Plaintiff was limited to occasional reaching with his right arm and another consultant's opinion that Plaintiff's ability to reach overhead with his right arm was occasionally limited, but he determined that Plaintiff retained the RFC to perform the full range of light work, and the court found this conclusion to be supported by substantial record evidence.  Thus, the ALJ did not err because his hypothetical question contained those limitations he found credible and supported by the record, and it excluded those he properly discounted as inconsistent with the record or not credible.[16]

---

[16]While it is not necessary for the court to consider it, the court notes the Commissioner's argument that Social Security Administration rulings "do not support the proposition that the loss of use of even an entire upper extremity is always disabling" (Doc. 13 at 6 (citing Social Security Ruling 83-12 ("Experience with persons who have lost the use of an upper extremity has shown that their potential occupational base is between the occupational bases for Table No. 1 (sedentary work) and Table No. 2 (light work)."; Social Security Ruling 87-11c (noting that "the loss of, or the loss of the use of, an arm or hand is not disabling per se, since prior court decisions have held that an individual who has lost the use of an arm or hand can still engage in substantial gainful activity."))).  In this case, the court found the ALJ's determination that Plaintiff could perform the full range of light work to be supported by substantial record evidence. If anything the Social Security Administration rulings cited by the Commissioner further support the ALJ's findings and cast even more doubt on Plaintiff's argument that he is disabled because of his alleged inability to fully use his right upper extremity.

Moreover, in addition to finding that Plaintiff can perform the unskilled jobs identified by the ALJ, the ALJ also found that Plaintiff retained the RFC "to perform a full range of light work" (Tr. 19).  Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  Id. at 1558; Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids").  Foote, 67 F.3d at 1558.  Exclusive reliance on the grids is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); Foote, 67 F.3d at 1559; Heckler v. Campbell, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills."  Walker v. Bowen, 826 F.2d 996, 1002–03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  Foote, 67 F.3d at 1559; Chester v. Bowen, 792 F.2d 129, 132 (11th Cir. 1986); see also MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  See Allen v. Sullivan, 880 F.2d 1200, 1202 (11th Cir. 1989); Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.  Foote, 67 F.3d at 1559.

In the instant case, the ALJ properly discounted Plaintiff's subjective complaints of pain and found that Plaintiff retained the ability to do the full range of light work.  Accordingly, the ALJ found that based on Plaintiff's age, education, and work experience the grids direct a finding of not disabled (Tr. 19).  The Medical-Vocational Guidelines at 20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.00 state that the ability to perform a "wide or full range of light work represents substantial work capability compatible with making a work adjustment to substantial numbers of unskilled jobs and, thus, generally provides sufficient occupational mobility even for severely impaired individuals who are not of advanced age and have sufficient educational competencies for unskilled work."  *See also* Social Security Ruling (SSR) 85-15.  Thus, considering Plaintiff's age, education, and work experience, the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.13, direct a finding of "not disabled" and support the ALJ's conclusion (Tr. 17–18, 19).

VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Based upon the foregoing, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Michael J. Astrue is substituted for Jo Anne B. Barnhart as Defendant.

And it is respectfully **RECOMMENDED**:

That the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 18th day of June 2007.

/s/ *Elizabeth M. Timothy*                                
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

      Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* **28 U.S.C. § 636; United States v. Roberts,** 858 F.2d 698, 701 (11th Cir. 1988).